Filed 3/16/21  In re S.K. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re S.K., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B307188 (Super. Ct. No. 20JD-00060) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.K.,<br><br>    Defendant and Appellant. | |

C.K. (Father) appeals jurisdictional and dispositional orders of the juvenile court following the filing of a Welfare and Institutions Code[1] section 300, subdivision (b)(1) petition by the

---

[1] All statutory references are to the Welfare and Institutions Code.

San Luis Obispo County Department of Social Services (DSS). The court ruled Father's daughter was a minor coming under the juvenile court law and it removed her from Father's home. We conclude, among other things, that substantial evidence supports the court's findings and orders. We affirm.

FACTS

S.K. is Father's teenage daughter. She lived in Father's home. Her mother (Mother) did not live there. Father is a military veteran and a large man. He knowns martial arts.

S.K. reported that Father uses martial arts against her and "does moves on her that are 'painful and annoying.'" On one occasion, when Father was drunk, he put her "in [a] choke hold[]."

S.K. told DSS that Father began drinking alcohol "a lot," beginning when she was in the sixth grade. She said Father physically abused her, starting when she was in the seventh grade. He used his fists to "slap her," leaving marks on her legs. She claimed he also became "verbally abusive" to her.

On April 22, 2020, S.K. called 911, stating Father had "attacked" her. The police arrived. A police officer saw S.K. running from the home and "crying hysterically." The officer saw a large cup, thrown by Father, "flying through the air narrowly missing [S.K.'s] head."

Father asked the police officer for the officer's gun. He told the officer he could not kill himself, but he said, "You guys can do it though, just end it." "[J]ust shoot me." The officer determined Father was suicidal and a danger to himself. Father was placed in handcuffs and transported to a hospital on a psychiatric hold.

DSS filed a juvenile dependency petition alleging Father could not adequately protect or care for S.K. due to his "mental

illness and/or substance abuse." S.K. was placed in foster care. DSS said Mother should not have physical custody. It noted that Mother had a history of drug addiction and has an "extensive [Child Welfare Services] history with her current children."

At a detention hearing, the juvenile court found that S.K. was a person described by section 300 and that there were no reasonable alternatives "to eliminate the need of removing [S.K.] from the home." The court ruled Father could have visits with S.K. supervised by DSS.

In a jurisdiction/disposition report, DSS recommended that S.K. be declared a dependent of the juvenile court and that she remain in "out-of-home placement." It noted Father's physical violence and verbal abuse, and that he did not address these issues, he did not complete his mental health assessment, he did not cooperate with DSS, and he was hostile to a DSS staff member.

A social worker testified that, while in Father's custody, S.K. had problems, including "using marijuana," drinking alcohol, and not completing school work. She reported that Father "slaps" her, leaving marks on her legs. She does not want "in-person visits" with Father. Father had not agreed to participate in therapy even though DSS determined it was necessary. Father told DSS he has PTSD and he takes medication for it. DSS has concerns about returning S.K. to Father's home because of his "alcohol use." S.K. says he "drinks alcohol regularly."

The social worker testified DSS staff have seen Father where he "appeared impaired" or intoxicated. On those occasions, he was "slurring his speech." Placement of S.K. with Mother would be detrimental because of her "known drug and alcohol

3

history."  Mother was aware of the "conflict" between Father and S.K., but she did not take any steps to intervene.

Father testified he did not drink 'regularly."  He said, "I'm pretty much a lightweight."  In response to the social worker's testimony about incidents where he slurred his speech, he said he had "a couple of wines," but he was coherent.  He uses "corporal punishment" against S.K. to defend himself.  If S.K. did something serious, he would "smack her on the butt," but never do so "close[d]-fisted."  He might "foot-sweep her."  S.K. has problems, including smoking "weed," drinking alcohol, and problems with her education.  Father testified he has PTSD and he takes antidepressant medication for his "mental health."  He wants S.K. back in his home.

Father testified he has not signed up for parenting classes.  He is not participating in therapy for his PTSD.  He believes he should not have to be tested for drugs.  He has not "undergone any alcohol treatment."  He would "agree to abstain from alcohol" if "it's to get [his] daughter back."  Father said he "wouldn't mind doing family therapy. . . .  [B]ut unfortunately, the current insurance [he has] does not cover [it]."

The juvenile court found the allegations of the petition to be true.  It declared S.K. to be a person described in section 300, subdivision (b)(1).  It ordered S.K. removed from Father and Mother and placed with a foster home.  It directed DSS to provide reunification services to Father and Mother.  It found they made "minimal" progress in addressing the "causes necessitating placement."

DISCUSSION

*Sustaining the Petition Against Father*

Father contends there is no substantial evidence to show that he presents a substantial risk of harm to S.K. He claims the jurisdictional and dispositional orders removing S.K. must be reversed. We disagree.

"The purpose of section 300 'is to provide maximum safety and protection for children . . . who are at risk [of harm].' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215.) "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], . . . the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child . . . ." (*Id.* at pp. 1215-1216.) "The court may consider past events in deciding whether a child presently needs the court's protection." (*Id.* at p. 1216.) "A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Ibid.*)

"We review the juvenile court's jurisdictional findings and disposition orders for substantial evidence." (*In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1216.) We do not decide the credibility of the witnesses; that is a matter for the trial court. We draw all reasonable inferences from the record in support of the court's findings and orders. (*Ibid.*) We do not weigh the evidence or resolve evidentiary conflicts. (*Ibid.*)

Father relies on his testimony. But the credibility of his testimony was decided by the juvenile court. As DSS notes, the court's findings show the court rejected much of Father's testimony. On appeal, the issue is not whether some evidence

5

supports appellant, it is whether substantial evidence supports the judgment.

S.K. told DSS that Father "practices martial arts and does moves on her that are 'painful and annoying.' " She said that he drinks, and in one incident, while he was doing "Saki bombs," he placed her in a "choke hold[]." On April 22, 2020, S.K. called 911, stating that Father "attacked" her. She said he "swung" at her and "took her down to the ground and kicked [her] shin." When the police arrived, a police officer saw S.K. running from the home and "crying hysterically." The officer also saw "a *large cup* flying through the air *narrowly missing [S.K.'s] head.*" (Italics added.) Father threw that cup. The juvenile court could reasonably infer this conduct showed Father presented a danger to the safety of S.K.

But Father's conduct became even more dangerous. Father asked the police officer for the officer's "9 mil" gun. The officer asked Father "if [Father] was thinking about killing himself." Father responded that "he could not because he was a Catholic." Father then said, "You guys can do it though, *just end it.*" (Italics added.) The officer determined Father was suicidal and "a danger to himself." Father was placed in handcuffs and transported to a hospital on a psychiatric hold. The juvenile court could reasonably find the April 22 incident showed S.K. was at risk while living in Father's home.

There were additional facts supporting the juvenile court's findings. The social worker testified that S.K. had concerns because of Father's "alcohol abuse." S.K. said Father "drinks alcohol regularly." In his testimony Father denied her claims that he had an alcohol abuse problem.

6

But DSS staff had personally seen Father intoxicated on more than one occasion during *very important* DSS interviews. On an unannounced visit, shortly after the April 22 incident, the social worker noticed that Father "appeared under the influence, due to his facial expression and droopy eyelids." The social worker testified he "was slurring his speech and was slow to respond." On June 2, 2020, there was a "Child Family Team" meeting via Zoom. Father showed signs of intoxication. He "slurred words," restated sentences, and had difficulty keeping track of the conversation.

Father testified that he "should not have to drug test in this case." He admitted drinking alcohol, but he said he was "a lightweight when it comes to alcohol." But the juvenile court could reasonably infer Father was in denial about his alcohol problem as shown by a DSS report. Father was initially screened by the Drug and Alcohol Services (DAS). But he told them that "if treatment was recommended, *he would refuse it*." (Italics added.) In June 2020, when a social worker called about testing, Father responded, "I know I'm not under the influence of anything so I don't need to go." The social worker noted that Father had missed testing dates on June 10 and June 19. When Father went to DAS testing on June 3, 2020, the results came back "positive for alcohol."

Father admitted that he had consumed alcohol on the day of the April 22 incident and that he had never "undergone any alcohol treatment."

"[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision." (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.) The juvenile court said Father was drinking alcohol

7

and taking antidepressant medications.  It noted that was a potentially dangerous combination.  The court could reasonably find Father's denial about his drinking problem and his negative attitude about treatment and testing were factors indicating he would not likely change his behavior and resolve this problem without continued court supervision.  (*Ibid.*)

DSS claimed Father's mental health disorder also placed S.K. at risk.  Father acknowledged that he had PTSD.  He testified that he went to his "behavioral health assessment," but he admitted that he had not been "participating in therapy." DSS determined that therapy was necessary.  The police determined Father was suicidal on April 22.  The juvenile court recognized the danger to S.K. based on the untreated mental health condition.  It noted that Father had questioned the importance of therapy.  The court found that he needed "to get to a good therapist," but Father had not sought such therapy. Given the April 22 incident, his alcohol problem, his denial, and his failure to seek therapy for his mental health illness, the court could reasonably infer that returning S.K. home would place her "at a substantial risk of serious physical harm."  (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226; *In re Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1215-1216; *In re Esmeralda B.*, *supra*, 11 Cal.App.4th at p. 1044.)

Moreover, the DSS jurisdiction/disposition report highlighted additional factors regarding Father's behavior which provided additional support for the juvenile court's finding and orders.  DSS said:  1) Father "has a history of physical violence and verbal abuse," 2) he has *failed to address these issues*, 3) he did not complete his mental health assessment, 4) he "has remained *uncooperative and hostile* with [DSS] throughout this

8

time," and 5) he has let the social worker know that he is "6'2" and 240 lbs." (Italics added.) DSS said it was concerned about returning S.K. to Father "prior to him *adequately addressing his mental health needs*, [because] this could continue to lead to physical altercations between [Father and S.K.], potentially causing physical injury." (Italics added.) The court could reasonably infer this supported the need for further DSS and court supervision before a decision could be made about returning S.K. to Father's home.

Father contends there were reasonable alternatives to removal of S.K. He notes that during his testimony he promised he would agree to family therapy and he would abstain from alcohol if S.K. were returned to him. But the credibility of that testimony was determined by the trial court. DSS notes the court could also "question the effectiveness of such measures when [Father] continued to deny any kind of alcohol problem" and had not sought individual mental health therapy. DSS also notes Father already "had a spotty record of complying with alcohol screenings." " 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

*Sustaining the Petition Against Mother*

Father contends the juvenile court improperly sustained the petition against Mother. He claims Mother did not pose a risk of harm for S.K. We disagree.

Mother had not been "involved in [S.K.'s] life for many years." Her recent involvement with S.K. "has been through social media." DSS was concerned about her lack of ability to meet S.K.'s "needs at this time." Mother had a very negative

9

history about taking care of her other children. DSS said Mother has an "*extensive* [Child Welfare Services] history with her current children." (Italics added.) She also has a "substance abuse history." Mother admitted that she previously "struggled with addiction" and was arrested for driving while intoxicated in 2018. DSS requested Mother to "participate in a Drug and Alcohol Assessment," but she did not comply. DSS asked Mother to "provide a spot-test." But Mother did not honor that request. DSS noted that Mother was aware of the problems S.K. had with Father. But Mother did not take any steps to intervene to protect S.K. Given these factors, Father has not shown the juvenile court erred by sustaining this petition. (*In re N.M.*, *supra*, 197 Cal.App.4th at pp. 169-170.)

The parties note that the juvenile court's order refers to removing S.K. from Mother. But S.K. did not live with Mother. As DSS notes, however, this language in the order does not change the result. The court has the authority to limit access to a child who does not live with the parent. That is essentially the same thing as an order removing a child. (*In re Julien H.* (2016) 3 Cal.App.5th 1084, 1090.)

*The Order Requiring Supervised Visits*

Father claims "the juvenile court abused its discretion in restricting [his] visits" with S.K. "to monitored visits." He claims visits should be unsupervised.

But there were several factors that supported this order, including the facts involving the April 22 incident and Father's untreated alcohol and mental health issues. DSS was also concerned about how S.K. viewed visitation. The social worker testified S.K. does not want "in-person visits" with Father. As to a phone call with Father, S.K. indicated that "she was most

10

comfortable having this call with her therapist as the supervisor." In addition, from the factors mentioned in the DSS jurisdiction/disposition report about Father's conduct and mental health, the juvenile court could reasonably decide this was not the time for unsupervised visits. We have reviewed Father's remaining contentions and we conclude he has not shown grounds for reversal.

DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

PERREN, J.

TANGEMAN, J.

11

Charles S. Crandall, Judge

Superior Court County of San Luis Obispo

_____

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Rita L. Neal, County Counsel, Timothy McNulty, Deputy, for Plaintiff and Respondent.